Filed 2/26/13  P. v. Aoatoa CA2/3

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>GLORIA JULIA AOATOA,<br><br>    Defendant and Appellant. | B242840<br><br>(Los Angeles County<br>Super. Ct. No. TA119244) |

APPEAL from a judgment of the Superior Court of Los Angeles County, John T. Doyle, Judge.  Affirmed.

John Alan Cohan, under appointment by the Court of Appeal, for Defendant and Appellant.

No appearance for Plaintiff and Respondent.

⸻

Gloria Julia Aoatoa appeals from the judgment entered following a jury trial which resulted in her conviction of carjacking (Pen. Code, § 215, subd. (a)),[1] second degree robbery (§ 211), assault by means of force likely to produce great bodily injury (§ 245, subd. (a)(1)), and grand theft of an automobile (§ 487, subd. (b)(1)). The trial court sentenced Aoatoa to five years in prison. We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

1. *Facts.*

   a. *The prosecution's case.*

At approximately 11:00 a.m. on June 18, 2011, Maria Umali was in Carson at the home of a friend named Joe. Joe lived in a garage, a portion of which had been converted into a bedroom. While Umali was in Joe's room, the defendant and appellant, Gloria Aoatoa, entered and stood behind her. According to Umali, she turned around, looked at Aoatoa and asked her " 'What's up?' " Aoatoa asked Umali, " 'Where's the rental?' " Umali believed that Aoatoa was asking her about a rental car, a brown PT Cruiser, which Umali had been in possession of for approximately one month while her own car, a white Toyota Corolla, had been in the shop being repaired. During that month, Umali had loaned the PT Cruiser out to others for money. She would charge the individuals the cost of the rental plus $5.[2] During that same month, Umali had seen Aoatoa at approximately three different houses and, at each one, the two women had taken drugs.

Umali had met with Aoatoa and a mutual friend at Umali's home on June 15, 2011. At that time, although it was "rent[ed] out," Umali was still in possession of the PT Cruiser. However when Aoatoa inquired about renting the car, Umali told Aoatoa that she would not rent it to her. Umali would only rent the car to people she knew well, and she did not know Aoatoa that well. Aoatoa was angry when Umali refused to rent the car to her. She apparently had wanted to drive it to San Bernardino to visit her children.

---

[1]     All further statutory references are to the Penal Code unless otherwise indicated.

[2]     Umali admitted that her insurance company was paying for the rental car and that she was "just trying to make some money off [it]."

2

Aoatoa did not give to Umali any money or drugs to rent the car and Umali returned it to the rental agency on June 17, 2011. So, when on June 18, Aoatoa arrived at Joe's and inquired about the rental car, Umali no longer had it in her possession. She, at that time, had only her own car, the Toyota.

After Umali indicated that she no longer had the rental car, Aoatoa accused her of lying. Umali stated that she was not lying and turned away from Aoatoa. At that point Aoatoa "socked" Umali in the back. Umali got on top of the bed and Aoatoa again asked her, " 'Where's the rental?' " Aoatoa began to insult Umali and call her names. At the same time, Umali noticed that Aoatoa was holding a belt. When Aoatoa started to swing her arm and hit Umali with the belt, Umali, after Aoatoa had hit her once, was able to "wrap[] [the belt] around [her] hand, and . . . grab[] it from [Aoatoa]."

By this time, both Umali and Aoatoa were on the bed and Aoatoa was on top of Umali. Umali "kicked [Aoatoa] off" of her. When Umali looked up, she saw Aoatoa standing "on the ground" looking at Umali's purse, which was sitting on the end of the bed. Umali, who was at that time standing on the bed, placed her foot on top of her purse. Aoatoa grabbed the purse and Umali "flipped" and fell backward, hitting her head against the wall. Her purse landed on the floor and when Aoatoa began to walk toward it, Umali stood up on the bed and dove to the floor "to grab [it]." Umali was then on her stomach, on the floor in a "tuck and roll position" on top of her purse. Aoatoa grabbed and pulled on Umali's hair and began punching her on the side of the face. As she was telling Umali to give her the purse, Aoatoa unsuccessfully attempted to "slam [Umali's] head to the ground." When Umali refused to give her the purse, Aoatoa began to "dig[] her nails" into the left side of Umali's face and neck. As she was scratching Umali, Aoatoa told her that she " 'wouldn't want to look in the mirror again' " and called her a " 'bitch.' " When Umali could no longer take the pain, she gave her purse to Aoatoa. Aoatoa took the purse, left the garage, took Umali's car keys from the purse, got into the car, which was parked behind the house, and drove off.[3]

---

[3] Three other people were in the room during the incident, Umali's friend Joe, another friend, Chad, and a woman named Janice. Umali did not know what Joe and Chad were

3

As Aoatoa drove away, Umali called 911. When officers arrived, she told them everything that had happened. In particular, Umali told a Detective Moseley that she had released her purse because "of the pain" Aoatoa was inflicting on her as she scratched Umali with her nails. Umali did not remember telling an Officer Popa that her Toyota had been parked near a gas station in Carson.

At approximately 8:45 p.m. on June 18, 2011, San Bernardino County Deputy Sheriff Emanuel Popa responded to a call which directed him to 25522 Fisher Street in the City of Highland, a town near San Bernardino. The dispatcher had reported that someone at that address had "rammed a vehicle into a gate." When the deputy arrived at the address, he observed a white Toyota Corolla "parked in the street directly in front of the driveway." The deputy noted that the front bumper of the car had been damaged and the gate by the driveway was "bent in." In addition, the front license plate from the Toyota was inside the gate. A man and a woman were standing on the right side of the Toyota and a woman was standing inside the gate. From inside the Toyota, Popa recovered a purse and a wallet.

The Toyota had been reported stolen and Umali had been listed as the victim. Popa spoke to Umali on the telephone at approximately 9:00 p.m. that night. During their conversation, Umali told the deputy that "her car had been stolen earlier that night from [an area near] a gas station . . . in Carson." Umali indicated that she had been "assaulted by an unknown female" and that she did not know anyone by the name of Gloria Aoatoa.

Popa met with Umali at the station later that night to "release the vehicle to her." When he saw her, Popa noted that Umali had a black eye and other injuries indicating that she had, in fact, been assaulted.

Los Angeles County Sheriff's Detective Michael Perea was the investigating officer in the matter. Perea first spoke with Umali on the telephone then, approximately one week after the incident during which her car had been taken, he had her come to the station. At that time, Perea noted that Umali "still had a scar on the left side of her face."

---

doing while Aoatoa was attacking her. Umali, however, remembered Janice telling her to just "let go of [her] purse."

4

During their interview, Umali told Perea about what had occurred on both June 15 and 18. As she was talking, Umali seemed "scared." Umali cried and the detective "could see that she was nervous about the entire incident. She was confused. She didn't know who to turn to. . . ."

It was during this interview that Perea showed to Umali a "six pack." After only seconds, Umali circled a photograph of Aoatoa and indicated that she was the individual who had stolen Umali's car and purse.

Throughout the investigation, Perea spoke with Umali on the telephone approximately 15 times. The detective indicated that, "oftentimes [Umali] was the one calling [him]." Although it did not come out in the initial investigation, at some point Umali told Perea about the rental car. The information, however, did not appear in either of the detective's reports because it was not "part of the original crime. The car that [had been] stolen was [Umali's Toyota]."

Perea's reports indicated that Umali had been attacked by Aoatoa and that she was "hit in the face several times with [a] belt." The first time Perea heard that Umali had been able to take the belt away from Aoatoa was during her testimony at trial. In addition, although Umali had told Perea that "there had been a prior meeting between the two of them," she never told Perea "how many times she'd [previously] had contact with . . . Aoatoa."

On June 17, 2012, the day before trial was set to begin, Umali, accompanied by her boyfriend, Dibbs, went to the home of her friend Steve. There, she met with Aoatoa and several other individuals. Aoatoa told Umali that she was sorry for what had happened and that she had "changed her life." Another individual suggested that Umali change her story and state that the whole incident "never happened." It was also suggested that she just not show up for court. However, Umali had been subpoenaed to testify in this matter and she was afraid that if she did not go to court, she would be arrested and put in jail. Aoatoa apparently told Umali that she could avoid being put in jail if she went to her doctor's office instead of to court and obtained from her doctor a note indicating that she had been there. Although Aoatoa never directly threatened Umali, she apparently told Umali that if

5

something were to happen to her, "people" would go after Umali. Umali, who at this point was quite frightened, agreed not to go to court. She stated that she had not wanted to "go through all this . . . drama . . . . [She] just wanted everything to . . . go away." Umali indicated that, "given what [Aoatoa had] said to [her] earlier about people coming after [her]" she was "still scared."

On June 18, 2012, the day before she was scheduled to testify, Umali, accompanied by her boyfriend, went to her doctor's office intending to get a note from him indicating that she could not go to court. After she was there for only a few minutes, she received a telephone call from the district attorney. After speaking with the district attorney, Umali and her boyfriend left the office. Umali never saw her doctor.

Umali stated that, had she not been subpoenaed, she would not have been in court. She was not testifying voluntarily and she did not want a lot of people involved in this case. Moreover, in view of Aoatoa's remarks regarding people coming after her, she had "stayed away from a lot of people." Umali indicated that she no longer "really kick[ed] it," she just stayed with her boyfriend.

b. *Defense evidence*.

Aoatoa testified that she and Umali had "[done] drugs together" for about a month. They had seen each other approximately 20 times before when, on June 15, 2011, they first had a conversation regarding the loaning of Umali's car to Aoatoa. On that day, a man named Jason had taken Aoatoa to Umali's house and, after they had gotten high, they talked about Aoatoa "renting the car." Umali had told Aoatoa that, if she gave Umali $50 that day, Aoatoa could use the brown PT Cruiser "all day" on June 18. Aoatoa and Umali then made arrangements to meet at Joe's house at 5:30 a.m. on the 18th.

On June 18, 2011, Aoatoa met Umali at Joe's house. The two women waited for approximately 30 minutes; however, the person who supposedly had the PT Cruiser did not show up. Umali told Aoatoa that if the PT Cruiser did not arrive by 6:30 a.m., Aoatoa could use Umali's Toyota. Aoatoa, however, would have to give to Umali "a little bit more money and . . . [she] couldn't use [the] car all day." Aoatoa agreed that if the PT Cruiser did not show up she would give to Umali more money and some drugs.

6

The PT Cruiser never arrived so, after Aoatoa gave to Umali some money and drugs, Umali gave to Aoatoa the keys to her Toyota and told Aoatoa that she could use the car for two hours. At approximately 6:45 a.m., Aoatoa drove off in the car, which had been parked in a small lot across an alley from Joe's house. The lot is not near a gas station or a Jack-In-The-Box restaurant. When Aoatoa left Umali, she was "in good, physical condition."

Aoatoa first drove to a friend's house, got high and "hung out with [Umali's car]." She did not return Umali's car in two hours as she had promised. Instead, she drove the car to San Bernardino, where she was ultimately involved in an accident. Aoatoa stated that she had kept Umali's car all day "because [she had given Umali] $50 to use [a PT Cruiser] all day." Aoatoa believed that it was Umali's "fault that the PT Cruiser [had not] show[n] up when it was supposed to[,] [s]o [she] decided to keep [Umali's] car all day."

Aoatoa knew that Umali had been renting the PT Cruiser to others for $30 a day. She had decided to pay Umali the $50 she had asked for because "there was a line of people who wanted to rent it" and she really needed a car to "go pick up [her] son from San Bernardino." However, when she got to San Bernardino, Aoatoa's son's father would not let him go back to Carson with her. Although this made Aoatoa angry, she did not use Umali's car to "ram [his] gate."

Aoatoa's trial was set to begin on June 18, 2012. According to Aoatoa, she and Umali met at Umali's friend Steve's house in Gardena on June 17, 2012. Aoatoa indicated that "a guy" had called her and told her that Umali "wanted to meet to talk about coming to court [that] Monday." Apparently, "the D. A. was harassing her and [was] scaring her about coming to court." During their meeting, Aoatoa did not "threaten" Umali or tell her that, if she, Aoatoa, went to jail that "other people would be looking for [Umali]." "All [Aoatoa] did was apologize for when [she] accidentally [became involved in an accident while in Umali's] car in San Bernardino." Moreover, Aoatoa never contacted Umali regarding setting up a meeting to talk about this case. Aoatoa did not even have Umali's telephone number.

7

Several other people were in the room during the meeting between Aoatoa and Umali and some of them began giving Umali suggestions with regard to "what she could do to get out of [going] to court." Aoatoa, herself, made no suggestions.

2. *Procedural history.*

Following a preliminary hearing, on April 12, 2012, Aoatoa was charged by information with one count of carjacking in violation of section 215, subdivision (a), during the commission of which she used a deadly and dangerous weapon, a belt with a buckle, within the meaning of section 12022, subdivision (b)(2) (count 1); one count of second degree robbery in violation of section 211, during the commission of which she used a deadly and dangerous weapon, a belt with a buckle, within the meaning of section 12022, subdivision (b)(1) (count 2); two counts of assault with a deadly weapon or by means of force likely to produce great bodily injury in violation of section 245, subdivision (a)(1) (counts 3 and 4); and one count of grand theft of an automobile in violation of section 487, subdivision (d)(1) (count 5). Aoatoa pled not guilty to each count and the matter was set for a jury trial.

Trial began on June 18, 2012. When the People offered Aoatoa a term of five years in prison in exchange for a plea of guilty or no contest on one count, she rejected the offer and indicated that she wished to proceed with the jury trial.

After the prosecution presented its case, Aoatoa made a motion to dismiss the matter pursuant to section 1118.1. After clarifying that the count alleging carjacking referred to the car while the count alleging robbery referred to Umali's purse, the trial court denied the motion.

After being instructed by the trial court and hearing counsels' arguments, the jury began deliberating. Both counsels agreed to waive presence should the jury ask for a read back of any of the testimony.

At approximately 11:00 a.m. on June 21, 2012, the jury requested a read back of Umali's testimony regarding the events which occurred on June 15, 2011, whether, on June 18, Aoatoa took just Umali's car keys or Umali's "entire purse," and when Umali

8

made the " '911 call.' " After hearing the testimony read back, at approximately 3:00 p.m. that same day, the jury foreperson indicated that the jury had reached verdicts.

The jury found Aoatoa guilty of carjacking in violation of section 215, a felony as charged in count 1. However the jurors found the allegation that, during the offense Aoatoa used a deadly weapon, a belt with a buckle, pursuant to section 12022, subdivision (b), not true. With regard to the charge of second degree robbery as alleged in count 2, the jury found Aoatoa guilty. It again, however, found the allegation that during the crime Aoatoa used a deadly and dangerous weapon not true. The jury found Aoatoa not guilty of the crime of assault with a deadly weapon, a belt with a buckle, in violation of section 245, subdivision (a)(1), as alleged in count 3. It, however, found her guilty of the crime of assault by means of force likely to produce great bodily injury in violation of section 245, subdivision (a)(1), as charged in count 4. Finally, the jury found Aoatoa guilty of the crime of "grand theft auto" in violation of section 487, subdivision (d)(1), a felony as alleged in count 5.

Aoatoa was sentenced on July 24, 2012. At the proceedings, her counsel asserted that Aoatoa had no prior criminal record and the jury had determined that "there was no weapon involved in [the] case." In view of these facts, counsel "ask[ed] the court to consider a probationary sentence or[,] in the alternative[,] the low term of three years." The prosecutor argued that the maximum sentence of nine years was appropriate. He stated, "[T]here was ample evidence to show that [Aoatoa participated] in the dissuading of Ms. Umali from testifying." In addition, although the jury did not characterize it as a deadly weapon, the evidence established that Aoatoa attacked Umali "with a belt at the inception of the incident." Finally, the prosecutor indicated that the People were not asking for the maximum sentence "based on the fact that Ms. Aoatoa exercised her right under the Constitution to take the witness stand and [give] her [side of the] story[,]" but because she had not told the truth. "[T]he jury . . . obviously did not buy or find her story to be credible."

The trial court indicated that it was going to sentence Aoatoa to state prison rather than county jail pursuant to section 1170, subdivision (h), because her conviction of assault

by means of force likely to produce great bodily injury in violation of section 245 acted as a "disqualifier" under the statute. The court then noted that the case had some "oddities." For example, the victim "was involved in some nefarious activity herself." The trial court, however, could not "discount [the] scratches" Aoatoa had inflicted upon Umali. The court indicated that Umali was "scratched up fairly bad[ly]." In addition, the trial court believed Aoatoa was involved in the process of "attempting to dissuade" Umali from testifying. The trial court, nevertheless, believed that a sentence of nine years in prison was too high.

The trial court denied a grant of probation and imposed as the principal term five years in prison for Aoatoa's conviction of carjacking in violation of section 215 as alleged in count 1. For Aoatoa's conviction of count 2, second degree robbery in violation of section 211, and count 4, assault by means of force likely to produce great bodily injury in violation of section 245, the court imposed concurrent midterms of three years in prison, then stayed the terms pursuant to section 654.[4] With regard to Aoatoa's conviction of count 5, grand theft auto in violation of section 487, the court imposed a term of two years in prison, then, as it had done with counts 2 and 4, stayed the term pursuant to section 654. In total, Aoatoa was sentenced to five years in prison. The trial court then granted her presentence custody credit for 37 days actually served and 37 days of good time/work time, for a total of 74 days.

The trial court imposed as to each count a $240 restitution fine (§ 1204.4, subd. (b)) and a stayed $240 parole revocation restitution fine (§ 1202.45). The court also ordered Aoatoa to pay a $40 court operations assessment as to each count (§ 1465.8, subd. (a)(1)), a $30 conviction assessment as to each count (Gov. Code, § 70373) and a $20 DNA fee (§ 296).

Aoatoa filed a timely notice of appeal on the day of sentencing.

---

[4]     Section 654 provides in relevant part: "(a) An act or omission that is punishable in different ways by different provisions of law shall be punished under the provision that provides for the longest potential term of imprisonment, but in no case shall the act or omission be punished under more than one provision. . . ."

## CONTENTIONS

After examination of the record, counsel filed an opening brief which raised no issues and requested this court to conduct an independent review of the record. By notice filed November 29, 2012, the clerk of this court advised Aoatoa to submit within 30 days any contentions, grounds of appeal or arguments she wished this court to consider. No response has been received to date.

## REVIEW ON APPEAL

We have examined the entire record and are satisfied counsel has complied fully with counsel's responsibilities. (*Smith v. Robbins* (2000) 528 U.S. 259, 278-284; *People v. Wende* (1979) 25 Cal.3d 436, 443.)

## DISPOSITION

The judgment is affirmed.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**


KITCHING, J.


We concur:


CROSKEY, Acting P. J.


ALDRICH, J.


11